## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALBERT L. HARTMAN III, derivatively on behalf of THE HARTFORD FINANCIAL SERVICES GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> LIAM E. MCGEE, CHRISTOPHER J. SWIFT, ROBERT RUPP, ROBERT B. ALLARDICE III, TREVOR FETTER, PAUL G. KIRK, JR., KATHRYN MIKELLS, MICHAEL G. MORRIS, THOMAS A. RENYI, CHARLES B. STRAUSS and H.PATRICK SWYGERT, <br><br> Defendants, <br><br> and <br><br> THE HARTFORD FINANCIAL SERVICES GROUP, INC., <br><br> Nominal Defendant. | Civil Action No. <br><br><br><br><br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Albert L. Hartman III ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant  The Hartford Financial Services Group, Inc. ("Hartford" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2012 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, Hartford is a leader in property and casualty insurance, group benefits and mutual funds.

3.     Throughout the Relevant Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operation, and prospects.   Specifically, defendants made false and/or misleading statements and/or failed to disclose: (1) that defendants had caused the Company to improperly calculate the value of the sale of its life-insurance business to Prudential Financial Inc. ("Prudential"); (2) that due to defendants' actions, the Company lacked adequate internal and financial controls; and (3) that, as a result of the foregoing, defendants caused the Company's financial results to be materially false and misleading at all relevant times.

4.     On March 1, 2013, defendants caused the Company to disclose that Hartford would be forced to restate its financial results for the third quarter of 2012 as a result of the sale of its life-insurance business to Prudential in 2012.   In September 2012, defendants had purportedly estimated that the deal would not generate a material gain or loss, but after finding an "error" in their calculations, defendants stated that Hartford actually suffered a $393 million loss on the transaction after taxes, due to the goodwill write-down.   Defendants further stated that they had found a "material weakness" in Hartford's internal control over financial reporting "that was resolved as of December 31."   As a result of the "error," a previously profitable fiscal 2012 was suddenly a year in the red.   More specifically, net income plummeted from $350 million to a *loss* of $38 million.

5.     Accordingly, as a result of defendants' breaches, the Company has been damaged. Further, it is clear that certain defendants have received excessive compensation for the year 2012, due to the fact that the compensation was based (at least in part) on false financial results.

**JURISDICTION AND VENUE**

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in

that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

7.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

8.      Plaintiff is a current shareholder of Hartford and has continuously held Hartford stock at all relevant times. Plaintiff is a citizen of Pennsylvania.

9.      Nominal defendant Hartford is a Delaware corporation, with its principal executive offices at One Hartford Plaza, Hartford, Connecticut 06155. According to its public filings, Hartford is a leader in property and casualty insurance, group benefits and mutual funds.

10.      Defendant Liam E. McGee ("McGee") has served as the Company's Chairman of the Board, President and Chief Executive Officer ("CEO") since 2009. Upon information and belief, defendant McGee is a citizen of Connecticut.

11.      Defendant Christopher J. Swift ("Swift") has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since March 2010. Upon information and belief, defendant McGee is a citizen of Connecticut.

12.      Defendant Robert Rupp ("Rupp") has served as the Company's Executive Vice

President and Chief Risk Officer since October 2011.  Upon information and belief, defendant Rupp is a citizen of Connecticut.

13.     Defendant Robert B. Allardice III ("Allardice") has served as a director of the Company since 2008.  In addition, defendant Allardice served as Chair of the Company's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Allardice is a citizen of New York.

14.     Defendant Trevor Fetter ("Fetter") has served as a director of the Company since 2007.  In addition, defendant Fetter served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Fetter is a citizen of Texas.

15.     Defendant Paul G. Kirk, Jr. ("Kirk") has served as a director of the Company since March 2010.  Previously, defendant Kirk served as a director of the Company from 1995 until September 2009.   Upon information and belief, defendant Kirk is a citizen of Massachusetts.

16.     Defendant Kathryn Mikells ("Mikells") has served as a director of the Company since 2010.  Upon information and belief, defendant Mikells is a citizen of Florida.

17.     Defendant Michael G. Morris ("Morris") has served as a director of the Company since 2004.  In addition, defendant Morris served as a member of the Audit Committee during the Relevant Period.    Upon information and belief, defendant Morris is a citizen of Michigan.

18.     Defendant Thomas A. Renyi ("Renyi") has served as a director of the Company since 2010.  Upon information and belief, defendant Renyi is a citizen of Maine.

19.     Defendant Charles B. Strauss ("Strauss") has served as a director of the Company since 2001.  In addition, defendant Strauss served as a member of the Audit Committee during the Relevant Period.    Upon information and belief, defendant Strauss is a citizen of Connecticut

and New York.

20.     Defendant H. Patrick Swygert ("Swygert") has served as a director of the Company since 1996.  Upon information and belief, defendant Swygert is a citizen of District of Columbia.

21.     Collectively, defendants McGee, Swift, Rupp, Allardice, Fetter, Kirk, Mikells, Morris, Renyi, Strauss and Swygert shall be referred to herein as "Defendants."

22.     Collectively, defendants Allardice, Fetter, Morris and Strauss shall be referred to as the "Audit Committee Defendants."

### DEFENDANTS' DUTIES

23.     By reason of their positions as officers, directors, and/or fiduciaries of Hartford and because of their ability to control the business and corporate affairs of Hartford, Defendants owed Hartford and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Hartford in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Hartford and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Hartford and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     Defendants, because of their positions of control and authority as directors and/or officers of Hartford, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Hartford, each of the Defendants had knowledge of material non-public

information regarding the Company.

25.     To discharge their duties, the officers and directors of Hartford were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Hartford were required to, among other things:

> a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

> b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

> c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

26.     Every member of the Board was a member of the Company's Finance, Investment and Risk Management Committee (the "Risk Committee").  According to the Risk Committee's Charter, every member of the Risk Committee (and thus, every member of the Board) is required to:

> a.  Review the investment strategy, portfolio composition and investment performance pertaining to invested asset portfolios of the Company;

> b.  Review capital, liquidity, and financing activities of the Company;

> c   Review the Company's major risk exposures, strategies, processes, and policies;

> d.  Review management processes, governance frameworks, and management reports supporting the Company's significant investment activities, financial management, and risk management activities; and

> e.  Report significant concerns resulting from its reviews to the Board.

27.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee

are required, *inter alia*, to:

    a.  Review with the management the quality and adequacy of internal controls that could significantly affect the Company's financial statements;

    b.  Review at least quarterly with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, or the performance of the internal audit function;

    c.  Discuss with management the Company's major financial risk exposures, the Company's policies with respect to risk assessment and risk management, and the steps management has taken to monitor and control these exposures;

    d.  Discuss with management the quality and adequacy of the Company's disclosure controls and procedures;

    e.  Prior to each quarterly earnings release, discuss with management the earnings press release, financial information and earnings guidance to be provided to investors, analysts or rating agencies;

    f.  Meet to review and discuss with management the Company's quarterly and annual financial statements; and

    g.  Review with the Company's General Counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or government agencies.

### SUBSTANTIVE ALLEGATIONS

**A.**    **<u>Company Background</u>**

28.    According to its public filings, the Company is a leader in property and casualty insurance, group benefits and mutual funds.

**B.**    **<u>Defendants' False and Misleading Statements</u>**

29.    On September 27, 2012, Defendants caused the Company to issue a press release entitled "The Hartford To Sell Individual Life Insurance Business To Prudential For $615 Million; Transaction To Provide A Net Statutory Capital Benefit Of $1.5 Billion." The press release set forth, in relevant part:

The Hartford, which announced in March that it would sharpen its focus on its property and casualty, group benefits and mutual funds businesses, ***has signed a definitive agreement to sell its Individual Life insurance business to Prudential Financial, Inc. for cash consideration of $615 million.*** The sale, which is structured as a reinsurance transaction, is expected to close in early 2013, subject to obtaining regulatory approvals and customary closing conditions. The Individual Life segment reported core earnings excluding DAC unlock, of $129 million for the 12 months ended on June 30, 2012, or net income of $105 million. ***The Hartford does not expect to record a material net income gain or loss on the closing of the transaction, based on June 30, 2012, financials.***

The agreement represents the final of three planned transactions that have been announced within the past three months. The Hartford announced the sale of Woodbury Financial Services to AIG's Advisor Group in late July and the sale of Retirement Plans to MassMutual in early September.

***"Today's announcement represents a significant milestone in the execution of The Hartford's strategy to deliver greater value to shareholders," said The Hartford's Chairman, President and CEO Liam E. McGee.*** "In about six months, we have completed three agreements, all executed at attractive valuations to strong financial institutions that have a strategic interest in the businesses. We are also pleased that Prudential is buying our Individual Life insurance business, where our policyholders and employees will benefit from the company's commitment to the life insurance market and strong service-oriented culture. The Hartford is taking the necessary actions, as outlined in March, to position the company for higher returns on equity, reduced sensitivity to capital markets, a lower cost of capital and increased financial flexibility."

***The Hartford expects the Individual Life transaction to benefit its net statutory capital by approximately $1.5 billion, including an increase in statutory surplus and a reduction in required risk-based capital.  In aggregate, the three announced transactions are expected to benefit the company's net statutory capital by approximately $2.2 billion, including approximately a $1.4 billion increase in statutory surplus and an $800 million reduction in required risk-based capital. In addition, the company will continue to hold approximately $450 million of statutory capital to support the businesses reinsured to buyers as part of the transactions.*** The estimated statutory financial impacts are based on June 30, 2012, values and are subject to change based on market conditions and financial results through closing date. The Hartford intends to work with its key constituencies on these transactions and expects to provide an update on the use of proceeds in early 2013.

Following the close of the transaction, Prudential will reinsure liabilities for the contracts covered by the agreement and assume investment assets with a statutory book value of approximately $7 billion in support of these liabilities. The terms of The Hartford's existing life insurance contracts will remain unchanged, and

policyholders will continue to receive uninterrupted, high-quality service, and The Hartford will continue to sell new life insurance products and riders through the transaction's closing and during a defined transition period thereafter. Employees of The Hartford's Individual Life business will be offered positions with Prudential. [Emphasis added, internal citations omitted.]

30.    On November 1, 2012, Defendants caused the Company to issue a press release entitled "The Hartford Reports Third Quarter 2012 Financial Results."   The press release set forth, in relevant part:

*The Hartford (NYSE:HIG) reported net income of $401 million, or $0.83 per diluted share, for the third quarter of 2012, compared with net income of $60 million, or $0.11 per diluted share, in the third quarter of 2011. The company also reported that third quarter 2012 core earnings rose to $378 million, or $0.78 per diluted share, from $50 million, or $0.08 per diluted share, in the third quarter of 2011.*

"The Hartford generated strong third quarter financial results, reflecting continued P&C pricing momentum and low catastrophes," said Chairman, President and CEO

Liam E. McGee. "Renewal pricing increased 8% in Standard Commercial, 4% in personal auto and 6% in homeowners, with higher retention in all three lines. Group Benefits long-term disability terminations improved, resulting in a slightly lower loss ratio. Fixed income deposits grew in Mutual Funds, resulting in significantly better net flows."

"The Hartford achieved several strategic objectives this quarter, including the successful completion of sales agreements, ahead of schedule, for Individual Life, Retirement Plans and Woodbury Financial Services," added McGee. "These transactions, which are expected to generate an approximately $2.2 billion statutory capital benefit, are a significant step forward in The Hartford's progress towards sharpening our focus on our P&C, Group Benefits and Mutual Funds businesses." [Emphasis added.]

31.    Also on November 1, 2012, Defendants caused the Company to file its quarterly report with the U.S. Securities and Exchange Commission ("SEC") on Form 10-Q.  The Form 10-Q reiterated the Company's financial results set forth in the press release, and represented that Goodwill as of September 30, 2012 totaled $1.006 billion.

32.     In addition, pursuant to the Sarbanes-Oxley Act of 2002, the Form 10-Q contained signed certifications ("SOX Certifications") by defendants McGee and Swift, stating that the financial information contained in the Form 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed.  The SOX Certification set forth:

I, [Liam E. McGee/Christopher J. Swift], certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of The Hartford Financial Services Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d- 15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*      \*      \*

In connection with the Quarterly Report on Form 10-Q for the period ended September 30, 2012 of The Hartford Financial Services Group, Inc. (the "Company"), filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned hereby certifies, pursuant to 18 U.S.C. section 1350 as enacted by section 906 of the Sarbanes-Oxley Act of 2002, that:

1) The Report fully complies with the requirements of section 13(a) or section 15(d) of the Securities Exchange Act of 1934; and

2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

33.     On February 4, 2013, Defendants caused the Company to issue a press release entitled "The Hartford Reports Fourth Quarter 2012 Financial Results; Announces 2013 Outlook And Capital Management Plan."  For the year ended December 31 2012, Defendants reported *net income of $350 million.*  In addition, the press release set forth, in relevant part:

The Hartford (NYSE:HIG) reported a net loss of $46 million, or $0.13 per diluted share, for the three months ended Dec. 31, 2012 (fourth quarter 2012) compared with net income of $118 million, or $0.23 per diluted share, for the quarter ended Dec. 31, 2011 (fourth quarter 2011). The decline in net income compared to the

prior year quarter was due to higher catastrophe losses, largely from Storm Sandy, restructuring and other costs, hedging losses on runoff annuity blocks, and increased net realized capital losses due to the sales of the Retirement Plans and Individual Life businesses.

Fourth quarter 2012 core earnings declined to $265 million, or $0.54 per diluted share, from $301 million, or $0.61 per diluted share, in the fourth quarter of 2011. The decrease in fourth quarter 2012 results was due to higher catastrophe losses as a result of Storm Sandy in the company's Property & Casualty (P&C) operations which were offset by improved results in Group Benefits, Corporate and Talcott Resolution, which is comprised of the company's legacy Wealth Management runoff businesses, as well as the Individual Life and Retirement Plans businesses that were sold in January, 2013.

The company also announced that it has reviewed with the Connecticut Insurance Department its capital management plans and that it has received approval from the Department for a $1.2 billion extraordinary dividend from its Connecticut domiciled life insurance companies. In addition, it expects to dissolve the company's Vermont life reinsurance captive and return approximately $300 million of surplus to the holding company. These actions are expected to be completed by the end of the first quarter of 2013.

*     *     *

The company also announced that it expects to reduce debt by approximately $1 billion, including the repayment of the 2013 and 2014 debt maturities totaling $520 million. In addition, The Hartford's Board of Directors has authorized a $500 million share repurchase program, expiring at Dec. 31, 2014.

"The Hartford had a strong finish to 2012 and the fourth quarter concluded a year of strategic accomplishments for the company," said The Hartford's Chairman, President and Chief Executive Officer

*Liam E. McGee. "Following the successful close of the sales of the life businesses, we enter 2013 with a sharper focus on the P&C, Group Benefits and Mutual Funds businesses. We are also very pleased to share our capital management plans, which will be accretive to shareholders and effectively balance a number of critical goals for The Hartford, including paying down debt, returning capital to shareholders and further strengthening our financial flexibility to take actions to reduce risk in the legacy annuity liabilities."*

"In the fourth quarter, pricing continued to improve across our P&C and Group Benefits businesses, with P&C Standard Commercial renewal written price increases of 9%. Group Benefits core earnings were up significantly in the fourth quarter. Consumer Markets achieved a combined ratio improvement of 2.4 points, excluding catastrophes and prior year development. I also want to express my

appreciation for the professionalism and dedication demonstrated by my Hartford colleagues in response to Storm Sandy," added McGee.

***The company also reported net income for the year ended Dec. 31, 2012 of $350 million, or $0.66 per diluted share, compared with 2011 net income of $712 million, or $1.40 per diluted share.*** The decline in net income was largely due to the second quarter $587 million loss on extinguishment of debt incurred as a result of the debt refinancing and increases in 2012 for net realized capital losses due to hedging of the company's runoff annuity blocks and for restructuring and other costs associated with the sales of the Retirement Plans, Individual Life and other businesses.

2012 core earnings totaled $1.4 billion, or $2.88 per diluted share, compared with $1.1 billion, or $2.24 per diluted share, in 2011. The increase in 2012 core earnings was principally due to a significant reduction in unfavorable prior year loss and loss adjustment expense reserve development (prior year development or PYD) in the company's P&C operations compared with 2011. [Emphasis added.]

34.     On February 28, 2013, one day before Defendants would shock the market (as set forth below), defendant McGee sold 131,781 shares of his personally held Hartford stock at $23.05 per share, for gross proceeds of $3,037,552.

35.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts: (1) that Defendants had caused the Company to improperly calculate the value of the sale of it life-insurance business to Prudential Financial Inc; (2) that due to Defendants' actions, the Company lacked adequate internal and financial controls; and (3) that, as a result of the foregoing, Defendants had caused the Company's financial results to be materially false and misleading at all relevant times.

### C.     The Truth Begins To Emerge

36.     On March 1, 2013, Defendants caused the Company to issue a press release entitled "The Hartford Amends Third Quarter 2012 Financial Results."  As a result of this "amendment," Hartford's full year 2012 net income swung from a profit of $350 million to a loss of $38 million.   The press release revealed, in relevant part:

The Hartford today reported that it has filed an amended Form 10-Q with the U.S. Securities and Exchange Commission (SEC) to restate its results for the third quarter ended September 30, 2012. The amended filing corrects for an error in the company's preliminary calculation of the gain or loss relating to the Individual Life business transaction under U.S. generally accepted accounting principles (GAAP). *The company is now reporting a full year 2012 net loss of $38 million and shareholders' equity of $22.4 billion at December 31, 2012, as compared with the previously reported 2012 net income of $350 million and shareholders' equity of $22.8 billion.* The company's 2012 core earnings of $1.4 billion are unchanged.

"We regret the error, but importantly the adjustments have no impact on our reported 2012 core earnings, statutory results or surplus, and announced capital management plan," said The Hartford's Chairman, President and Chief Executive Officer Liam E. McGee. "The Individual Life, Retirement Plans and Woodbury Financial Services transactions were attractive for The Hartford and completed on favorable financial terms. They generated an aggregate statutory capital benefit of $2.2 billion and this remains unchanged."

*In September 2012, The Hartford estimated that the Individual Life transaction would not generate a material gain or loss under GAAP. Following the identification of the error, the company estimates that the transaction will result in a GAAP loss of $393 million, after tax.* This estimate is subject to change pending the final determination of net assets sold, transaction costs and other adjustments. The error resulted from the omission of the impact of certain reinsurance recoverable balances on the gain/loss calculations for the transaction.

*   *   *

*The revised third quarter 2012 financial results include a $388 million after-tax loss related to the transaction, which reflects the impairment of goodwill and the establishment of a loss accrual for premium deficiency.* Net realized investment losses of $5 million, after tax, related to the transaction were included in the company's announced fourth quarter 2012 financial results.

*The company's previously filed financial statements for the third quarter of 2012 should no longer be relied upon. In addition, the company has determined that there was a material weakness in its internal control over financial reporting at September 30, 2012, which was remediated as of December 31, 2012.* [Emphasis added.]

37.     Accordingly, as a result of Defendants' breaches, the Company has been damaged.   Further, it is clear that certain of the Defendants have received excessive compensation for 2012, due to the fact that the compensation was based (at least in part) on false

financial results.

## DERIVATIVE AND DEMAND ALLEGATIONS

38.     Plaintiff brings this action derivatively in the right and for the benefit of Hartford to redress the breaches of fiduciary duty and other violations of law by Defendants.

39.     Plaintiff will adequately and fairly represent the interests of Hartford and its shareholders in enforcing and prosecuting its rights.

40.     The Board currently consists of the following nine (9) directors: defendants McGee, Allardice, Fetter, Kirk, Mikells, Morris, Renyi, Strauss and Swygert.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

    a.  During the Relevant Period, defendants Allardice, Fetter, Morris and Strauss served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls.  Defendants Allardice, Fetter, Morris and Strauss breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.  Therefore, defendants Allardice, Fetter, Morris and Strauss each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile; and

    b.  The principal professional occupation of defendant McGee is his employment with Hartford as the Chairman of the Board, President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   In addition, according to the Company's Proxy Statement filed with the SEC on Form DEF 14A on April 5, 2012, Defendants have admitted that defendant McGee is not independent.  Thus, defendant McGee lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant McGee faces a substantial likelihood of liability for breach of fiduciary duties in connection with his February 28, 2013 sale of his personally held Hartford stock; and

c. During the Relevant Period, every member of the Board (i.e. Defendants McGee, Allardice, Fetter, Kirk, Mikells, Morris, Renyi, Strauss and Swygert) was a member of the Risk Committee. Pursuant to the Risk Committee Charter, the members of the Risk Committee were and are responsible for, *inter alia*, reviewing capital, liquidity and financing activities of the Company, reviewing the Company's major risk exposures, and reviewing management processes supporting the Company's financial management and risk management activities. Defendants McGee, Allardice, Fetter, Kirk, Mikells, Morris, Renyi, Strauss and Swygert Strauss breached their fiduciary duties of due care, loyalty, and good faith, because the Risk Committee, *inter alia*, allowed or permitted the Company to engage in the sale of its life-insurance business to Prudential and to completely and utterly miscalculate the damage that this transaction would inflict upon the Company. Therefore, defendants McGee, Allardice, Fetter, Kirk, Mikells, Morris, Renyi, Strauss and Swygert each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

41. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

42. As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Hartford disseminated accurate, truthful and complete information to its shareholders.

43. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Hartford shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

44. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY**
**DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS**

45.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

46.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

47.     Defendants willfully ignored the obvious and pervasive problems with Hartford's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

48.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**COUNT III**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR**
**FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY**

49.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

50.     Defendants owed and owe Hartford fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Hartford the highest obligation of good faith, fair dealing, loyalty and due care.

51.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

52.     As a direct and proximate result of Defendants' failure to perform their fiduciary

- 17 -

obligations, Hartford has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

53.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

54.     Plaintiff, on behalf of Hartford, has no adequate remedy at law.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

55.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

56.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Hartford.

57.     Plaintiff, as a shareholder and representative of Hartford, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

58.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

59.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Hartford, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Hartford to misrepresent material facts regarding its financial position and business prospects.

60.     As a direct and proximate result of Defendants' abuse of control, Hartford has sustained significant damages.

61.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

62.    Plaintiff, on behalf of Hartford, has no adequate remedy at law.

## COUNT VI
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

63.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

64.    Defendants had a duty to Hartford and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Hartford.

65.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Hartford in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Hartford's affairs and in the use and preservation of Hartford's assets.

66.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Hartford to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Hartford, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Hartford.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing Hartford to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.     Awarding to Hartford restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: April 2, 2013

*Michael H. Rudy*

**MICHAEL H. RUDY (ct27208)**
Attorney at Law
87 Rising Ridge
Ridgefield, Connecticut 06877
Telephone:     (203)431-2269
Facsimile:      (203)431-2269
E-mail**:        mrudy11@comcast.net**

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
Christopher L. Nelson
22 Cassatt Avenue, First Floor
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

**DEL SOLE CAVANAUGH STROYD LLC**
Benjamin J. Sweet
Edwin J. Kilpela, Jr.
200 First Avenue, Suite 300
Pittsburgh, PA 15222
(412) 261-2393
Fax: (412) 261-2110

Counsel for Plaintiff